UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:21-CR-160-MOC-DSC

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| | ) | |
| vs. | ) | ORDER |
| | ) | |
| KERRY ADAM SHINE, | ) | |
| | ) | |
| Defendant. | ) | |

**THIS MATTER** is before the Court on Defendant's Motion to Suppress. (Doc. No. 16). The Court held a hearing on the motion on December 20, 2021.

**FINDINGS AND CONCLUSIONS**

I. **BACKGROUND**

Defendant Kerry Adam Shine was charged in this district by Bill of Indictment on June 15, 2021, with two counts of Possession of a Firearm by a Felon. (Doc. No. 1). He now moves to suppress his statements made to law enforcement and his firearms and ammunition seized by officers with the Charlotte-Mecklenburg Police Department (CMPD) on July 31, 2019, and August 12, 2020.

Defendant contends that on July 31, 2019, his Fourth and Fifth Amendment rights were violated because he was questioned by officers while in custody without first being warned of his Miranda rights and his firearm was seized from his car without legal justification. He further argues that on August 12, 2020, his Fourth Amendment rights were violated because officers conducted a traffic stop without a sufficient basis, illegally frisked him, and then searched his car

without probable cause. He asserts that, as a result, his statements and the physical evidence seized should be suppressed. For the following reasons, the Court denies the motion to suppress.

### A. The Stop on July 31, 2019

During the afternoon of July 31, 2019, CMPD Detective Harmon was driving an unmarked vehicle on Independence Boulevard when he noticed a Chevy Impala pass by him at a high rate of speed. The Impala weaved in and out of traffic before Detective Harmon lost sight of it. Shortly after, Detective Harmon came to a red light at Albemarle Road and noticed that the same Impala was directly in front of him. He checked the license plate number through a law enforcement database and saw that it had two registered owners: a female and a male. He discovered that the male owner had outstanding warrants. Detective Harmon pulled up next to the Impala and confirmed that the driver, Defendant Kerry Adam Shine, matched the photos of the registered owner. Detective Harmon followed the Impala to a nearby gas station and watched Defendant exit the car and go inside the store.

Detective Harmon confirmed Defendant's warrants with CMPD headquarters and requested assistance from patrol officers. When Defendant returned to his car, the detective approached him and placed him under arrest for the warrants. Patrol officers arrived on the scene and took Defendant to a marked CMPD car nearby. Defendant first asked them to explain why he had a warrant. They told him that he had three warrants, but they needed to search him before talking to him. As Officer Ryans searched Defendant, Defendant asked if he could smoke a cigarette before going in. An officer asked if Defendant had someone to come pick up the car, to which Defendant responded that he did not. The officer explained that if Defendant did not have anyone to pick up the car, it would be towed. Defendant told officers to let him get his phone out of the car. As the detective walked toward the Impala, Defendant added, "And I got a rifle in the car,

Imma let you know right now." An officer asked where it was, and Defendant responded that it was in a box.

Officers looked through the window of the Impala and saw a Hi Point .40 caliber rifle in plain view behind the front passenger seat. The rifle was in its original box with the lid open. An officer removed the loaded rifle from the vehicle. The detective checked Defendant's name in a law enforcement database and discovered he was a convicted felon.

### B. The Stop on August 12, 2020

On August 12, 2020, at around 5:41 p.m., two CMPD officers were riding together in Charlotte when they saw a Buick Roadmaster cross a double yellow line to pass another car on a two-lane road, forcing the officer to abruptly slow down as the Buick came into his lane of travel to avoid a collision. As the officer turned around, the Buick took off at a high rate of speed and eventually made a right turn, then pulled into the driveway of a home. As the officers pulled onto that street, Officer Luiz saw the driver, Defendant, lean forward and to the right as he was looking over his shoulder to the left. Officer Luiz also saw a second occupant in the front passenger seat. When the patrol vehicle pulled behind the Buick, Defendant immediately got out of the car.

The two officers walked up to the car as Officer Luiz told Defendant to get back in, which he did not do. Instead, Defendant asked why as he stood next to the open driver's door. When Officer Luiz started to detain Defendant, he attempted to get back into the vehicle. Defendant pulled one hand forward to smoke a cigarette as the officer tried to place him in handcuffs. Once he was handcuffed, Defendant asked what was going on. The officer responded that he was going to check him to make sure he did not have a weapon on him. Defendant said that he could pat him down, but he did not consent to any searches. Officer Luiz frisked Defendant for

3

weapons and found a Glock magazine with ten rounds of 9mm ammunition in his front right pocket.

Officer Luiz noticed an open beer can in the vehicle's center console area. The passenger stayed in his seat and was drinking another can of beer until the second officer detained him when Officer Luiz found the magazine on Defendant. Officer Luiz began to search the Buick once other officers arrived to take control of Defendant and his passenger. Officer Luiz immediately found a Glock, model 43x, 9mm caliber pistol concealed under the driver's seat. It was loaded with nine rounds of ammunition and one in the chamber. Officers also found a Glock, model 22, .40 caliber pistol under the front passenger seat.

Defendant was moved to a CMPD car as an officer checked his criminal history. The officer discovered that Defendant had been convicted of a felony and had outstanding arrest warrants for assault on a female, assault with a deadly weapon, injury to personal property, and communicating threats.

## II. DISCUSSION

### A. The July 31, 2019 Stop

Defendant first moves to suppress the evidence uncovered in the July 31, 2019 stop, arguing that Defendant's Fourth and Fifth Amendment rights were violated. (Doc. No. 16 at 5–8). Defendant argues that the police did not have legal authorization to seize the rifle in the back seat of his car under the Fourth Amendment because "no amount of probable cause can justify a warrantless search or seizure absent exigent circumstances" and, Defendant argues, the police did not have an exigent circumstance. (Id. at 6, citing Coolidge v. New Hampshire, 403 U.S. 443, 468 (1971)). Defendant argues that his mere acknowledgment that a firearm was in the vehicle

4

Case 3:21-cr-00160-MOC-DSC   Document 30   Filed 04/25/22   Page 4 of 19

was not enough to create an exigent circumstance justifying a warrantless search. For the following reasons, Defendant's contentions are without merit.

**1. Officers were not required to inform Defendant of his Miranda rights before he spontaneously told them about his firearm.**

Pursuant to Miranda v. Arizona, 384 U.S. 436 (1966), officers must generally give certain well-established warnings before interrogating a suspect who is in custody. However, Miranda warnings are only required when a person in custody is interrogated, meaning that he is subjected to express questioning or "to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980). "Volunteered statements of any kind are not barred by the Fifth Amendment." Miranda, 384 U.S. at 478; United States v. Wright, 991 F.2d 1182, 1186–87 (4th Cir. 1993). "[I]n determining whether police conduct is the functional equivalent of interrogation, the intent of the police, although not the focus, can be relevant to the determination." United States v. Blake, 571 F.3d 331, 339 (4th Cir. 2009) (citing Innis, 446 U.S. at 301 n.6).

In New York v. Quarles, 467 U.S. 649 (1984), the Supreme Court recognized "a 'public safety' exception to the requirement that Miranda warnings be given before a suspect's answers may be admitted into evidence," and explained that the exception applies when "police officers ask questions reasonably prompted by a concern for the public safety." Id. at 655–56. Thus, officers are not required to advise individuals of their Miranda rights before asking "questions necessary to secure their own safety or the safety of the public." Id. at 659. However, "questions designed solely to elicit testimonial evidence from a suspect" do not fall under the exception. Id. This exception frees officers "to follow their legitimate instincts when confronting situations

presenting a danger to the public safety." Id. The exception applies to protect the safety of the police, as well as the public, and should be analyzed from the "objective perspective of the presence of a public danger." United States. v. Mobley, 40 F.3d 688, 692 (4th Cir. 1994) (citing Quarles, 467 U.S. at 655–56).

The Government asserts that it does not intend to introduce evidence of Defendant's statements made after he told officers where the gun was. However, the Government contends that Defendant's earlier statement informing officers that a rifle was in the car is admissible because it was volunteered. The Court agrees. Law enforcement did not ask Defendant a question that elicited that response. Instead, Defendant made the declaration spontaneously when it became clear to him that officers were heading for his car. When he made the statement, the officers had not said anything reasonably likely to elicit an incriminating response from him. Just before Defendant's spontaneous statement, an officer told him that his car would be towed if no one could come pick it up. Explaining to an arrestee what would happen with his property is part of the arrest process as well as a duty that officers routinely discharge to keep arrestees informed. This statement, having nothing to do with a firearm, and made before officers knew about the existence of his rifle, was not likely to elicit an incriminating response from Defendant.

Moreover, Officer Ryans' follow-up question to Defendant regarding the location of his firearm falls squarely within the public safety exception to the requirement of Miranda warnings. This question to determine where the firearm was, after just being told there was a rifle in a car that was parked at a public gas station in the middle of broad daylight, was reasonably prompted by a concern for public safety. That is, at the suppression hearing, officers testified that Defendant's unoccupied car was parked at a busy gas station in a high-volume area. (Hearing Tr. at 27). In a short portion of body-worn camera video alone, four vehicles were visible, one of

6
Case 3:21-cr-00160-MOC-DSC   Document 30   Filed 04/25/22   Page 6 of 19

which was right beside Defendant's car for an extended period of time. (Id. at 26). Detective Harmon also testified that there was a man standing outside of the store within ten feet of the car, another person standing outside of another car, and people walking in the gas station. (Id. at 27). Officer Alwran testified that the gas station was populated, and people were walking around. (Id. at 40–41).

Furthermore, the officer's question to Defendant at the scene was limited solely to the location of the gun. He did not follow up with questions about who owned it or why it was there, that could more fairly be characterized as an effort to elicit testimonial evidence. Instead, the officer's isolated question about the firearm's location was aimed at securing the safety of his fellow officers and the public. See, e.g., United States v. Young, 58 F. App'x 980, 982 (4th Cir. 2003) (per curiam) (unpublished) (Quarles applied in part because "the questions asked were limited to the presence of weapons and did not suggest any attempt to elicit testimonial evidence").

Under these circumstances, the officer was warranted in asking his one limited question without first advising the defendant of his Miranda warnings. Defendant volunteered to officers that he had a rifle in his car. An officer followed up by asking the location of that firearm out of a concern for the safety of officers and the public. Accordingly, officers did not need to inform Defendant of his Miranda rights before he made these statements, and his statements are therefore admissible.

**2. Officers properly seized Defendant's rifle when they saw it in plain view on the rear floorboard of his vehicle.**

When officers approached Defendant's vehicle in a public parking lot with people around, they saw, in plain view, a rifle behind the front passenger's seat. One of many exceptions

7

to the Fourth Amendment's warrant requirement is the plain view doctrine, which justifies the seizure of property in plain view when "(1) the officer is lawfully in a place from which the object may be plainly viewed; (2) the officer has a lawful right of access to the object itself; and (3) the object's incriminating character is immediately apparent." United States v. Jackson, 131 F.3d 1105, 1109 (4th Cir. 1997) (citing Horton v. California, 496 U.S. 128, 136–37 (1990)). As for the officer's seizure of the rifle, the Fourth Circuit has approved of preventive seizures for the purpose of public safety. Mora v. The City Gaithersburg, Md., 519 F.3d 216 (4th Cir. 2008). The Fourth Circuit has recognized that "guns present particular dangers that more readily justify warrantless searches of automobiles" and that cars containing legal handguns may be searched without a warrant in some circumstances. United States v Graham, 686 F. App'x 166, 170–71 (4th Cir. 2017) (unpublished).

The seizure of a firearm that is not obvious contraband but is in plain view is reasonable under the Fourth Amendment when an officer reasonably believes that the gun "posed an immediate danger to officer or public safety." United States v. Bishop, 338 F.3d 623, 628 (6th Cir. 2003). The officer may at least temporarily seize the firearm as a reasonable safety precaution. Id.; United States v. Koepnick, 409 F. App'x 138 (9th Cir. 2011); see United States v. Rodriguez, 601 F.3d 402 (5th Cir. 2010). Exigent circumstances may also justify warrantless searches or seizures. United States v. Hill, 649 F.3d 258 (4th Cir. 2011). Officers need only a reasonable suspicion that the exigent circumstances exist at the time of their seizure to successfully assert this exception to the warrant requirement. Figg v. Schroeder, 312 F.3d 625, 639 (4th Cir. 2002).

Here, as discussed, the officers reasonably believed that an unattended rifle in plain view posed a threat to officer and public safety. The evidence at the suppression hearing showed that

Defendant's car was parked at a pump at a busy gas station where multiple people were coming and going in broad daylight. The officers explained that they were concerned that someone would see the rifle in plain view in Defendant's back seat, and they wanted to make sure no one had access to it for public and officer safety reasons. (Hearing Tr. at 26–41). It was reasonable for the officers to believe that the gun could have been taken by any passerby that noticed a large firearm in an empty car. Because officers gave Defendant the benefit of calling someone to pick up his vehicle, they did not know how long it would sit unattended in the parking lot, making all the more reasonable their concern that someone else could take the firearm. Under these circumstances, a firearm could "fall into untrained or perhaps malicious hands" and pose a danger to the public, rendering its temporary seizure reasonable. See Cady v. Dombrowski, 413 U.S. 433, 443 (1973).

Moreover, since Defendant had been alone in the car, the three options for the car were for it to be towed, left alone, or a friend of Defendant to come pick it up. The officer had a reasonable concern that a tow company employee or Defendant's associate would be in danger if they accidentally touched a firearm in the car that they did not know was there, as they may have accidentally grabbed the trigger. Additionally, the officers did not know if Defendant had associates nearby at the gas station watching their interaction or if his friend would come to pick up the car, both which would put them at danger as they prepared to leave the scene if the firearm was accessed, requiring them to act immediately. Therefore, the officers' decision to seize the rifle to prevent it from being used against another person was reasonable in light of the risk of an unattended obvious firearm to public safety. See United States v. Moats, No. 21-4002, 2021 WL 4859608, at *2 (4th Cir. Oct. 19, 2021) (finding that officers acted prudently by seizing

a gun for officer safety purposes when the handle was visible in a suspect's pocket); see also United States v. Newbourn, 600 F.2d 452 (4th Cir. 1979).

### 3. Officers would have inevitably discovered the firearm by lawful means.

The Court finds that, alternatively, suppression of the rifle is not warranted because law enforcement would have inevitably discovered the firearm by lawful means if they had waited to seize the firearm until after they checked Defendant's criminal history because they would have discovered that he was a felon. Evidence is admissible if it would have inevitably been discovered without the police error because there is not a sufficient nexus to provide a taint. Nix v. Williams, 467 U.S. 431, 448 (1984). The government must prove by a preponderance of the evidence that the "police legally could have uncovered the evidence; and second, that police would have done so." United States v. Alston, 941 F.3d 132, 138 (4th Cir. 2019) (citing United States v. Allen, 159 F.3d 832, 840 (4th Cir. 1998)). When "an inevitable search falling within an exception to the warrant requirement . . . would have inevitably uncovered the evidence," lawful means could have discovered the evidence. United States v. Bullette, 854 F.3d 261, 265 (4th Cir. 2017).

Detective Harmon testified at the suppression hearing that he walked over to Defendant's car to get his phone and keys because he asked for them. (Hearing Tr. at 11). He also testified that he was not sure if the car was going to be towed or left on scene, so he would have looked in the car window to make sure it was safe and secure. (Id. at 14). He stated that he would have checked Defendant's criminal history once he saw the firearm, and he would have seized it after discovering that Defendant had been convicted of a felony. (Id. at 13–15).

Defendant suggests that Detective Harmon testified that he did not confirm Defendant's status as a felon while at the gas station that day. But Defendant's suggestion is misplaced

because Detective Harmon was referring specifically to the moment when his body-worn camera video was paused during his testimony. (Id. at 23). By that time, he had not checked Defendant's status as a felon, but he also testified that he would have confirmed his status eventually because of the existence of the firearm. He also testified that he believed another officer said that Defendant was a felon, which is consistent with Officer Ryans' testimony that he looked up Defendant's felon status at some point, although he could not remember when. (Id. at 23, 36). This does not mean that Officer Ryans, or another officer, did not also check Defendant's criminal record on scene. Moreover, watching Detective Harmon's body-worn camera video past the moment he was asked about shows the detective tell another officer that Defendant "is going to be a felon," corroborating the detective's testimony that he did in fact confirm that information on scene. See (Defense Ex. 1).

The officers were not going to leave an unoccupied vehicle in a public parking lot to be towed or picked up by a third party without at least peeking through the window to see the interior. Because Defendant told officers that he had a firearm and they saw it through the car window, they were going to check his criminal history while on scene to see if he was a felon and unable to possess firearms. Once they saw or heard about the gun, it was inevitable that the officers would check his record, see that he was a felon, and seize the firearm before leaving the scene that day. Had they waited to seize the rifle until after they checked his criminal history, the search of his car and seizure of the firearm would have been justified under the automobile exception to the warrant requirement at that point. The police can search a vehicle without a warrant when the car "is readily mobile and probable cause exists to believe it contains contraband." Maryland v. Dyson, 527 U.S. 465, 467 (1999).

11
Case 3:21-cr-00160-MOC-DSC   Document 30   Filed 04/25/22   Page 11 of 19

In sum, even if Defendant's firearm was improperly seized from his car before officers knew that it was evidence of a crime, the officers would have uncovered the same evidence in a lawful manner because they still would have seized the firearm after confirming that he was a convicted felon.

For all the reasons stated by the Court, the motion to suppress related to the July 31, 2019, stop is denied.

### B. The August 12, 2020 Stop

Defendant also moves to suppress evidence of the firearm police found underneath the driver's seat of his vehicle during the traffic stop on August 12, 2020. He argues that the traffic stop was unreasonable because the officers did not have a reasonable belief to suspect him of a traffic infraction, (Doc. No. 16 at 8–10), that the officers' frisk was unreasonable because it was conducted without a reasonable belief he was armed and dangerous, and because it went beyond a pat-down, (id. at 10–12), and that the officers lacked probable cause to search the vehicle, (id. at 12–13). For the following reasons, Defendant's contentions are without merit.

**1. Officer Luiz had reasonable suspicion to believe that Defendant was armed and dangerous and therefore properly frisked him for weapons.**

The Fourth Amendment permits law enforcement to stop and briefly detain a person for investigative purposes with either reasonable suspicion or probable cause. See United States v. Sokolow, 490 U.S. 1, 7 (1989) (recognizing that investigatory stops require that the police have at least a minimal level of objective justification for a stop); see also Terry v. Ohio, 392 U.S. 1, 30 (1968). Brief investigative stops are lawful when an officer has "a particularized and objective basis for suspecting the particular person stopped of criminal activity." United States v. Cortez, 449 U.S. 411, 417–18 (1981). A decision to conduct a traffic stop is reasonable under the

12

Case 3:21-cr-00160-MOC-DSC    Document 30    Filed 04/25/22    Page 12 of 19

Fourth Amendment where a police officer has probable cause to believe that a traffic violation has occurred, regardless of how minor the traffic offense may be. Whren v. United States, 517 U.S. 806, 810–817 (1996); United States v. Hassan-El, 5 F.3d 726, 730 (4th Cir. 1993) (stating that an officer is justified in stopping a vehicle when he or she "observes a traffic offense or otherwise unlawful conduct").

In evaluating the propriety of a stop, courts should consider "the totality of the circumstances" and give "due weight to common sense judgments reached by officers in light of their experience and training." United States v. Perkins, 363 F.3d 317, 321 (4th Cir. 2004). Proof necessary to demonstrate reasonable suspicion is "considerably less than proof of wrongdoing by a preponderance of the evidence" and "obviously less than is necessary for probable cause." Navarette v. California, 572 U.S. 393, 397 (2014) (internal quotation and citation omitted). An officer does not have to "rule out the possibility of innocent conduct." Id. at 403.

"[A]n officer who makes a lawful traffic stop and who has a reasonable suspicion that one of the automobile's occupants is armed may frisk that individual for the officer's protection and the safety of everyone on scene." United States v. Robinson, 846 F.3d 694, 696 (4th Cir. 2017). Officers are not required by the Fourth Amendment to "take unnecessary risks in the performance of their duties." Id. (quoting Terry v. Ohio, 392 U.S. at 23). The protective frisk is justified by the dangerous combination of the presence of a weapon and a compulsory police encounter, not because the possession of the weapon is illegal. Robinson, 846 F.3d at 696. "Roadside encounters between police and suspects are especially hazardous." Michigan v. Long, 463 U.S. 1032, 1049 (1983). The potential for harm is increased when the stop involves more than one occupant. Robinson, 846 F.3d at 698–99.

Here, Officer Luiz observed Defendant violate multiple North Carolina laws. Officer Luiz testified that he turned his patrol car around after seeing Defendant pass another car on a double-yellow line, almost causing a collision by coming into the officer's lane. (Hearing Tr. at 52). Officer Luiz turned on his blue lights and siren, and Defendant "took off at a high rate of speed," about 70 miles per hour in a 35 mile per hour speed limit zone. (Id.). Defendant contends that it would have impossible for him to be driving that fast. Defendant uses a distance of 0.4 miles, plus 128 feet traveled, to calculate that his speed must have been about 50 miles per hour. (Doc. No. 26 at 17). Defendant's own exhibit, however, shows that the distance was 0.5 miles, which would make the average speed, by his own calculation, around 60 miles per hour. See (Defense Ex. A).

Moreover, Defendant's calculation demonstrates the average speed if he was driving at the exact same rate the entire time. There is no evidence Defendant's speed was constant. Instead, Officer Luiz testified that he "took off" at around 70 miles per hour. (Hearing Tr. at 52). Defendant may have slowed down once he gained sufficient distance from the patrol car and was not traveling at 70 miles per hour the entire time Officer Luiz followed. In any event, regardless of Defendant's speed, he did not stop when a police car turned around and turned on its blue lights and sirens behind him to pull him over. Officer Luiz therefore reasonably believed Defendant was attempting to elude law enforcement. A suspect's evasive behavior upon seeing the police is a relevant factor in the reasonable suspicion analysis under Terry. See United States v. Griffin, 589 F.3d 148, 153 (4th Cir. 2009).

Moreover, Officer Luiz found Defendant parked in the first driveway on a side street, which was unusual to him. (Hearing Tr. at 53). Office Luiz testified that, in his experience, cars trying to elude or flee will pull into a neighborhood and driveway to pretend like that is where

they are supposed to be. (Id.). Courts take the officer's experience into account when determining whether he had reasonable suspicion. United States v. Branch, 537 F.3d 328, 336–37 (4th Cir. 2008); United States v. Tinnie, 629 F.3d 749, 751–52 (7th Cir. 2011).

Officer Luiz also saw Defendant leaning forward and reaching down "underneath the front seat center console area," while looking over his left shoulder "trying to see if [the officer] was coming by." (Hearing Tr. at 54, 60). The officer reasonably believed that these motions indicated Defendant was trying to hide a weapon or reach for one. (Id. at 56). The Fourth Circuit has recognized that a suspect's furtive movements and evasive behavior as officers approach are relevant factors in the reasonable suspicion analysis. See United States v. George, 732 F.3d 296, 299 (4th Cir. 2013) ("A suspect's suspicious movements can also be taken to suggest that the suspect may have a weapon."); United States v. Spearman, 254 F. App'x 178, 180–81 (4th Cir. 2007) (per curiam) (unpublished) (finding that the situation grew more suspicious and dangerous when detectives saw the suspect watch them approach his vehicle and ducked his shoulder to reach under the driver's seat); see also United States v. Griffin, 589 F.3d 148, 153 (4th Cir. 2009).

Here, once the officer got out of the patrol car, Defendant immediately opened his door and got out of his vehicle while the passenger stayed in his seat. (Hearing Tr. at 54–56). Defendant questioned the officer's command to get back in his car and tried to raise a cigarette to his lips while being handcuffed. (Id. at 55). The Fourth Circuit has held that an officer's Terry frisk was justified under similar circumstances based on a suspect reaching beneath a vehicle's passenger seat after stopping coupled with his "evasive and alarmed behavior." United States v. Fridie, 442 F. App'x 839, 841 (4th Cir. 2011) (per curiam) (unpublished). The Fourth Circuit has also upheld a district court's finding that officers reasonably suspected a suspect of being armed

15

and dangerous when they observed him moving suspiciously as if reaching under his seat as officers approached and he did not comply with orders to keep his hands raised. United States v. Price, 717 F. App'x 241, 243–44 (4th Cir. 2018) (unpublished).

Officer Luiz testified that he believed Defendant possessed a weapon on his person or in his vehicle based on his reaching down in the car, attempt to flee or elude the traffic stop, immediate exit of the car to distance himself from it, attempt to get back in the car when the officer tried to detain him, and failure to heed the officer's commands. (Hearing Tr. at 58). When an officer "reasonably suspects that the person he has stopped is armed, the officer is warranted in the belief that his safety . . . [is] in danger, thus justifying a Terry frisk." Robinson, 846 F.3d at 699 (internal quotation marks and citation omitted). In sum, the combination of the factors facing Officer Luiz would lead a reasonably prudent officer to believe Defendant had a weapon and the officers' safety or that of others was in danger. See George, 732 F.3d at 300; see also Branch, 537 F.3d at 339.

**2. Officer Luiz was justified in frisking Defendant and searching Defendant's car.**

For these same reasons, Officer Luiz was acting lawfully when he looked under the driver's seat and found Defendant's handgun. Police officers may search the portions of the passenger area of a car where a weapon could be placed when they reasonably believe that the suspect is armed and dangerous and "may gain immediate control of weapons." Michigan v. Long, 463 U.S. 1032, 1049 (1983); United States v. Guerrero, 19 F.4th 547, 554 (1st Cir. 2021). Such a protective sweep of a vehicle can be justified even if the suspect is no longer in the car and "is under police restraint at the time the search is conducted, because the suspect may be able to escape such restraint, or may later regain access to the vehicle if he is not arrested." United

States v. Elston, 479 F.3d 314, 320 (4th Cir. 2007); United States v. Griffin, 589 F.3d 148, 154 (4th Cir. 2009).

Officer Luiz appropriately retrieved the loaded magazine from Defendant's pocket because he immediately recognized it as a firearm magazine, indicating to him that Defendant had a firearm on his person or in his vehicle. (Hearing Tr. at 58). A magazine could be used as a weapon and is an "essential part of a lethal weapon," which poses a grave danger when loaded into a firearm. See United States v. Johnson, 921 F.3d 991, 998 (11th Cir. 2019) (finding that an officer's seizure of ammunition from a suspect's pocket was reasonable because he was "entitled to take steps to assure himself" that it "would not be loaded into 'a weapon that could . . . fatally be used against [him]'") (quoting Maryland v. Buie, 494 U.S. 325, 333 (1990)). Officer Luiz was justified in searching the car for the accompanying firearm once he found this loaded magazine because he did not find the firearm on Defendant during his frisk.

Additionally, Officer Luiz did not just find a firearm magazine. He first saw Defendant leaning forward and reaching down in the car while looking over his shoulder for the officer. (Hearing Tr. at 54, 60). Officer Luiz also observed Defendant get out of the car immediately once the officer opened his door, as if trying to distance himself from it and whatever was inside. (Id. at 68–69). Although Defendant was out of the car, the other passenger remained in it until Officer Luiz found the magazine on Defendant and Officer Blackmon asked him to step out. The passenger then stood next to the car and easily could have accessed a firearm in it before officers could stop him. (Def. Ex. 3). Officer Luiz did not know whether Defendant and his passenger would be getting back in the car and leaving at the end of their interaction. (Hearing Tr. at 61). Therefore, a reasonably prudent person would believe a weapon was in Defendant's car and

needed to be found so that neither of the two men could gain access to it during or after the traffic stop.

Additionally, carrying a concealed firearm is a criminal offense itself, and a reasonably prudent person would believe a firearm was concealed in Defendant's car after finding a magazine. N.C. GEN. STAT. § 14-269. When Officer Luiz saw the passenger actively drinking a beer and a matching open can in the center cupholder, he reasonably believed that one of those beers belonged to Defendant. (Gov. Ex. 4; Hearing Tr. at 60). Therefore, probable cause also existed to search the Defendant's vehicle for evidence of these criminal offenses. See United States v. McGuire, 957 F.2d 310, 314 (7th Cir. 1992) (finding that a trooper had probable cause to believe a car contained additional evidence once he discovered that it was transporting open alcohol in violation of state law); see also United States v. Howton, 260 F. App'x 813, 817 (6th Cir. 2008) (unpublished) (holding that troopers had probable cause to search for other open containers being transported in the vehicle after observing an open beer can in a cupholder); State v. Fizovic, 240 N.C. App. 448, 455 (2015) (stating that "there may exist tangible evidence of a violation of open container laws–specifically, open containers of alcohol–that an officer may reasonable expect to find in a suspect's vehicle").

**3. Officers would have inevitably discovered Defendant's firearm and magazine loaded with ammunition.**

The Court finds that, alternatively, the officers would have discovered Defendant's magazine and firearm during their encounter with him even if Officer Luiz did not frisk him at the start of their interaction. While at the scene, an officer checked Defendant's criminal history and informed Officer Luiz that he was a convicted felon. (Hearing Tr. at 61). An officer also ran Defendant's license plate number and told Officer Luiz that it matched the driver. (Def. Ex. 3 at

18
Case 3:21-cr-00160-MOC-DSC   Document 30   Filed 04/25/22   Page 18 of 19

14:11–15:36). Defendant had four outstanding warrants for his arrest. (Hearing Tr. at 61). Officer Luiz would have checked to see whether Defendant had arrest warrants that day. (Id. at 64). Officer Luiz testified that he routinely does so during traffic stops and commonly discovers that someone has outstanding warrants when he conducts a traffic stop. (Id. at 63–64). Office Luiz testified that when he discovered Defendant's arrest warrants, Officer Luiz would have arrested him and searched him incident to arrest, uncovering the magazine. (Id. at 64). The officer would have checked Defendant's criminal history and searched his car for the firearm. (Id.). Luiz testified that he always checks to see whether someone is a felon when he finds a firearm in their possession. (Id. at 63). Here, Defendant committed the crimes of carrying a concealed weapon, in violation of N.C. GEN. STAT. § 14-269, and possessing the ammunition in the magazine in his pocket, as well as the firearm, both in violation of Title 18 U.S.C. § 922(g)(1). Because Officer Luiz lawfully discovered Defendant's magazine, ammunition, and firearm, and would have lawfully done so even if he had not frisked Defendant, the evidence found at the traffic stop will not be suppressed.

For all the reasons stated by the Court, the motion to suppress related to the August 12, 2020, stop is denied.

### ORDER

**IT IS, THEREFORE, ORDERED** that Defendant's Motion to Suppress, (Doc. No. 16), is **DENIED**.

Signed: April 25, 2022

Max O. Cogburn Jr.
United States District Judge